# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ARGENTUM MEDICAL, LLC, | |
| Plaintiff, | NO. 3:08-CV-1305 |
| v. | (JUDGE CAPUTO) |
| NOBLE BIOMATERIALS, and DERMA SCIENCES, INC., | |
| Defendants. | |

## MEMORANDUM

Presently before the Court is Plaintiff Argentum Medical's "Motion to Strike Answer to Amended Complaint, Counterclaim, or in the Alternative, Motion to Dismiss Counterclaims Against Gregg Silver and Thomas Miller." (Doc. 112.) For the reasons detailed below, the Court will deny Argentum's motion to strike and alternative motion to dismiss Noble's counterclaims.

The Court has jurisdiction in this matter pursuant to 28 U.S.C. §§ 1331 and 1338.

## BACKGROUND

The current case arises under the Patent Laws of the United States and was initiated by Plaintiff Argentum Medical, LLC ("Argentum") against Defendant Noble Biomaterials ("Noble") and Defendant Derma Sciences, Inc. ("Derma") in the Northern District of Illinois on December 3, 2007. (Compl., Doc. 1.) The Plaintiff, Argentum, is a limited liability company organized and existing under the laws of the State of Delaware with a principal place of business in Willowbrook, Illinois. (Doc 1 ¶ 2.) Argentum makes and sells, under the trade name SILVERLON, a silver-coated nylon wound and burn dressing covered by United States Patent Number 7,230,153 ("the '153 Patent"). (Doc. 113 at 1.) Defendant Noble is

a corporation organized and existing under the laws of the State of Delaware with a principal place of business in Scranton, Pennsylvania.  (Doc. 1 ¶ 3) Noble is in the business of manufacturing fibers microscopically coated in silver and other noble metals, and has sold these metalized fibers under the trade name X-STATIC for a number of years.  (Doc. 117, at 2.) In 2005, Noble began producing and selling wound dressings and burn care products from X-STATIC fibers, selling these products under the trade name SILVERSEAL.  (*Id.* at 4.) Defendant Derma is a corporation organized and existing under the laws of the State of Pennsylvania with a principal place of business in Princeton, New Jersey. (Doc. 1 ¶ 4.) Derma is a distributor of certain medical products, including products manufactured by Noble and marketed under the X-STATIC and SILVERSEAL trade names.  (Doc. 56, Ex. A; Doc. 117, at 5.)

On April 21, 2008, Argentum filed an Amended Complaint bringing four (4) counts against the Defendants. (Am. Compl., Doc. 45.) Count I of the Amended Complaint alleged a patent infringement claims against Defendants Noble and Derma.  Count II alleged a false designation of origin claim against Derma.  Counts III and IV alleged state law claims for deceptive trade practices and tortious interference with a prospective economic advantage.

On May 12, 2008 Noble moved to dismiss Count I of Argentum's Amended Complaint pursuant to Federal Rules of Civil Procedure 12(b)(2), 12(b)(3), and 12(b)(6) or, in the alternative, transfer the case to the Middle District of Pennsylvania.  (Doc. 46.) On May 16, 2008, Derma filed a Third Party Complaint against Noble, (Doc. 56), along with a separate motion to transfer this case to the Middle District of Pennsylvania or, in the alternative, stay the proceedings with respect to Derma pending resolution of Argentum's patent infringement claim against Noble (Doc. 57).  On June 23, 2008, the Hon. George W. Lindberg found that

Argentum had not provided evidence that Noble had "(1) sold or distributed the allegedly infringing products in Illinois, (2) knew that Illinois was the likely destination of the allegedly infringing products, or (3) took any action with respect to the allegedly infringing products that was purposefully directed toward Illinois" and had, "therefore failed to establish a *prima facie* case of personal jurisdiction." (Doc. 73, at 4.) Judge Lindberg, accordingly dismissed Count I as to Noble for lack of personal jurisdiction. (*Id.*) Judge Lindberg also found that "the factors argued by the parties establish that party and witness convenience would be better served . . ." and that "the interest of justice [would be] served by transferring this case to the Middle District of Pennsylvania." (*Id.*, at 5-6.) The case was, accordingly, transferred to this Court on July 8, 2008. (Doc. 75.)

After obtaining the Court's leave to amend and add a party, Argentum filed its Second Amended Complaint on September 4, 2008, re-adding Noble to this case. (Doc 89.) On November 12, 2008, Noble filed its Answer to Argentum's Second Amended Complaint, also providing affirmative defenses and stating counterclaims against Argentum and two of its managers, Thomas Miller and Gregg Silver. (Doc. 102.) On December 1, 2008, Argentum filed its Answer to Derma Services' Counterclaim. (Doc. 105) On January 27, 2009, Argentum filed the current motion, requesting that this Court either strike or dismiss Noble's counterclaims against Miller and Silver (Doc. 112) along with a corresponding Brief in Support (Doc. 113). Noble filed a corresponding Brief in Opposition (Doc. 117) on February 18, 2009, and Argentum filed its Reply Brief (Doc. 122) on March 18, 2009. Thus, the Court finds that the current motion has been fully briefed and is currently ripe for disposition.

## LEGAL STANDARD

A motion pursuant to Rule 12(b)(2) "is inherently a matter which requires resolution

of factual issues outside the pleadings." *Time Share Vacation Club v. Atlantic Resorts, Ltd.*, 735 F.2d 61, 66, n.9 (3d Cir. 1984). When a defendant raises the question of whether the district court has personal jurisdiction over that defendant, the plaintiff bears the burden of showing personal jurisdiction exists. *GE v. Deutz AG*, 270 F.3d 144, 150 (3d Cir. 2001); *Mellon Bank (East) PSFS, Nat'l Assn v. Farino*, 960 F.2d 1217, 1223 (3d Cir. 1992). A plaintiff may meet this burden by "establishing with reasonable particularity sufficient contacts between the defendant and the forum state." *Farino*, 960 F.2d at 1223 (internal quotation omitted.) However, the plaintiff may not rest solely on its pleadings to satisfy this burden. *Red Square Corp. v. Novik, Inc.*, CA No. 07-498, 2007 U.S. Dist. LEXIS 56217, *6 (W.D. Pa. Aug. 2, 2007) (citing *Carteret Sav. Bank, FA v. Shushan*, 954 F.2d 141, 146 (3d Cir. 1992)). "General averments in an unverified complaint or response without the support of 'sworn affidavits or other competent evidence' are insufficient to establish jurisdictional facts." *Vector Security, Inc. v. Corum*, CA No. 03-741, 2003 U.S. Dist. LEXIS 6573, *2 (E.D. Pa. Mar. 21, 2003) (quoting *Time Share Vacation Club*, 735 F.2d at 66, n.9); *see also Farino*, 960 F.2d at 1223. Otherwise, for purposes of deciding the motion to dismiss, this Court must "accept the plaintiff's allegations as true, and . . . construe disputed facts in favor of the plaintiff." *Toys 'R' Us, Inc. v. Step Two, S.A.*, 318 F.3d 446, 457 (3d Cir. 2003) (citation omitted.)

If the plaintiff is successful in demonstrating that jurisdiction "comport[s] with fair play and substantial justice," the defendant must subsequently "present a compelling case that. . .render [s] jurisdiction unreasonable." *Miller Yacht Sales, Inc. v. Smith*, 384 F. 3d 93, 97 (3d Cir. 2004) (quoting *Burger King Corp, v. Rudzewicz*, 471 U.S. 462, 476-477 (1985)). Determining the reasonableness of exercising jurisdiction requires the court to consider

4

several factors, e.g., 'the burden on the defendant, the forum state's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, the interest of the interstate judicial system in obtaining the most efficient resolution of controversies, and the shared interest of the several States in furthering fundamental substantive social policies." *Burger King*, 471 U.S. at 477; *Farino*, 960 F.2d at 1222.

## DISCUSSION

**I.      Argentum's Motion to Strike Noble's Counterclaims Against Miller and Silver**

In its brief in support of the current motion, Argentum states that "[o]n their face, Noble's 'counterclaims' as against Silver and Miller are improper under the Federal Rules of Civil Procedure." (Doc. 113, at 5.) Argentum supports this statement by arguing that "neither Silver nor Miller is an 'opposing party' within the meaning of Rule 13. . ." and that Rule 13(h) "requires more than Noble's filing counterclaims . . . [because] the Court must determine if joinder of such parties, under Rules 19 or 20, is proper." (*Id*.) In response, Noble argues that "[t]he Federal rules have not required a party. . . to obtain leave of court to join counterclaim defendants in the last 43 years. . .." (Doc. 117, at 7.)

The District Court for the Eastern District of Pennsylvania was presented similar arguments in *Neyer, Tiseo & Hindo, Ltd. V. Russell*, No. 92-2983, 1993 U.S. Dist. LEXIS 2738 (E.D. Pa. March 2, 1993). The *Neyer* court reviewed decisions from numerous district courts, noting that, in some jurisdictions, "practice apparently continues to contemplate an order to join additional parties. . .." *Neyer*, 1993 U.S. Dist. LEXIS 2738, at *8-9 (citing *Mountain States Sports, Inc. v. Sharman*, 353 F. Supp. 613, 618 (D. Utah 1972)). The Court also observed that several courts have held that "leave of the court was not required to join an additional party pursuant to Rule 13(h). . . based. . . on the fact that the 1966 revision of

5

Rule 13(h) dropped the words that 'the court shall order additional parties to be brought in' and thus eliminated the need to obtain leave of the court to bring in new parties." *Id.* at *9 (citing *Northfield Ins. Co. v. Bender Shipbuilding & Repair Co.,* 122 F.R.D. 30, 31 (S.D. Ala. 1988); *Vermont Castings, Inc. v. Evans Products Co., Grossman's Div.,* 510 F. Supp. 940 (D.Vt. 1981)). The *Neyer* court also noted that these prior decisions had "held that eliminating the need to obtain leave complied with the spirit of the Federal Rules of Civil Procedure by eliminating unnecessary motions." *Id.* On the basis of its review, the *Neyer* court held that

> [t]he fact that some courts continue to comport with the practice of filing a motion for joining additional parties does not elevate that practice to a rule requirement. Instead, this court is persuaded by the spirit of the Federal Rules to eliminate unnecessary motions and by those courts that have held that Rule 13(h) does not require leave of the court to join additional parties.

*Id.*, at *10. The Court agrees with the *Neyer* court's analysis, will apply it in the current case, and will not strike the counterclaims against Miller and Silver for failure of Noble to seek the Court's leave to join them as parties.

II. **Argentum's Alternative Motion to Dismiss Noble's Counterclaims Against Miller and Silver for Lack of Personal Jurisdiction**

Argentum also states that "[t]his Court lacks jurisdiction over Silver and Miller." (Doc. 113, at 6.) In support of this statement, Argentum argues that Silver, Argentum's Chief Executive Officer, has had no contacts with the state of Pennsylvania and this Court, accordingly lacks personal jurisdiction over him. (*Id.*; Silver Decl., Doc. 113, Ex. B.) With respect to Miller, Argentum's President, Argentum notes that he "has made sales calls on customers in Pennsylvania. . . and met with two Argentum consultants in Pennsylvania." (Doc. 113, at 7.) Argentum argues, however, that these actions were solely on the behalf

6

of Argentum, had nothing to do with Noble's counterclaims, and that Miller has no other contacts with Pennsylvania. (*Id.*) Accordingly, Argentum argues that Miller does not satisfy the "minimum contacts" requirement for personal jurisdiction. (*Id.*)

In response, Noble concedes that Miller and Silver have not engaged in continuous or systematic contacts within Pennsylvania sufficient to subject them to the general jurisdiction of this Court. (Br. in Opp., Doc. 117, at 8-9.) Noble does, however, "submit that [Miller and Silver] have engaged in sufficient forum-related activities to have reasonably anticipated being haled into a Pennsylvania Court to defend Noble's Counterclaims." (*Id.* at 9.) Noble further urges the Court to apply the three-part "effects test" established by the Untied States Supreme Court in *Calder v. Jones*, 465 U.S. 783 (1984), to determine whether this Court has specific jurisdiction over Miller and Silver. (*Id.*)

### A. The Three-Part Test for Specific Personal Jurisdiction

In *Calder*, the United States Supreme Court considered whether a California court could exercise personal jurisdiction over two Florida residents, a reporter and editor for the National Enquirer, who had published an allegedly libelous story about a California resident. 465 U.S., at 784-89. The Supreme Court first identified and discussed the minimum contacts requirement for personal jurisdiction:

> The Due Process Clause of the Fourteenth Amendment to the United States Constitution permits personal jurisdiction over a defendant in any State with which the defendant has "certain minimum contacts . . . such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.' *Milliken v. Meyer*, 311 U.S. 457, 463." *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945). In judging minimum contacts, a court properly focuses on "the relationship among the defendant, the forum, and the litigation." *Shaffer v. Heitner*, 433 U.S. 186, 204 (1977). *See also Rush v. Savchuk*, 444 U.S. 320, 332 (1980). The plaintiff's lack of "contacts" will not defeat otherwise proper jurisdiction, *see Keeton v. Hustler Magazine, Inc.*, [465 U.S. 770,] 779-781 [1984], but they may be so manifold as to permit jurisdiction

7

> when it would not exist in their absence. Here, the plaintiff is the focus of the activities of the defendants out of which the suit arises. *See McGee v. International Life Ins. Co.*, 355 U.S. 220 (1957).

*Calder*, 465 U.S., at 788. Applying this jurisprudence to the facts presented, the Supreme Court found that:

> petitioners are not charged with mere untargeted negligence. Rather, their intentional, and allegedly tortious, actions were expressly aimed at California. [They] wrote and. . . edited an article that they knew would have a potentially devastating impact upon respondent. And the knew that the brunt of that injury would be felt by respondent in the State in which she lives and works and in which the National Enquirer has its largest circulation. Under the circumstances, petitioners must "reasonably anticipate being haled into court there" to answer for the truth of the statements made in their article. *World-Wide Volkswagen Corp. v. Woodson*, [444 U.S. 286,] 297 [(1980)]; *Kulko v. California Superior Court*, [436 U.S. 84,] 97-98 [(1978)]; *Shaffer v. Heitner*, *supra*, at 216. An individual injured in California need not go to Florida to seek redress from persons who, though remaining in Florida, knowingly cause the injury in California.

*Calder*, 465 U.S., at 789-90. The *Calder* court further noted that the petitioners' "status as employees does not somehow insulate them from jurisdiction. Each defendant's contacts with the forum State must be assessed individually." *Id.* at 790 (citing *Rush v. Savchuk*, 444 U.S., at 332). The Third Circuit Court of Appeals has consistently applied the Supreme Court's *Calder* holding and has succinctly stated that the *Calder* "effects test" requires a plaintiff to show that:

> (1) The defendant committed an intentional tort;
>
> (2) The plaintiff felt the brunt of the harm in the forum such that the forum can be said to be the focal point of the harm suffered by the plaintiff as a result of that tort;
>
> (3) The defendant expressly aimed his tortious conduct at the forum such that the forum can be said to be the focal point of the tortious activity.

*Remick v. Manfredy*, 238 F.3d 248, 258 (3d Cir. 2001) (quoting *Imo Industries, Inc. v. Kiekert*

*AG*, 155 F.3d 254, 265-66 (3d Cir. 1998)). Thus, the question currently before the Court is whether Noble's Counterclaims asserted against Miller and Silver–specifically Counts IV, V, and VI–satisfy each of the three *Calder* effects test prongs.

1. Intentional Tort

Noble's Counterclaims against Miller and Silver include claims of unfair competition (Count IV), violations of the Lanham Act (Count V), and product disparagement (Count VI). (Doc. 102 ¶¶ 100-112.) Since each of Noble's Counterclaims pertaining to Miller and Silver allege intentional torts, the Court finds that they satisfy the first prong of the *Calder* effects test. *See Metallic Ceramic Coatings, Inc. v. Precision Prods.*, No. 00-CV-4941, 2001 U.S. Dist. LEXIS 1224, at *15 (E.D. Pa., Feb. 13, 2001) (identifying unfair competition and trademark infringement as intentional torts); *Nationwide Contr. Audit Serv. v. Nat'l Compliance Mgmt. Servs., Inc.*, No. 08-08, 2008 U.S. Dist. LEXIS 45370, at *61 (W.D. Pa., June 10, 2008) (agreeing with plaintiff that alleged Lanham Act violations are intentional torts and satisfy the first *Calder* prong); *Schering Corp. v. First DataBank, Inc.*, No. C 07-01142 WHA, 2007 U.S. Dist. LEXIS 29433, at *18 (N.D. Cal., Apr. 10, 2007) (stating that product disparagement is an intentional tort).

2. Focal Point of Harm

The Court also finds that Noble's counterclaims against Miller and Silver satisfy the second prong of the *Calder* test. Noble states that its principal place of business is in Scranton, Pennsylvania and the alleged tortious conduct impacts and harms its business. (Doc. 102 ¶¶ 38, 102-104, 108, 111-112.) Thus, the Court believes that Nobel may reasonably contend that it suffered the brunt of harm in Pennsylvania. *See Remick*, 238 F.3d, at 258-59 (citing *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 780 (1984)) (finding

9

that individuals endure the bulk of harm from torts like defamation in their home state).

### 3. Focal Point of Tortious Activity

"To establish that the defendant 'expressly aimed' his conduct, the plaintiff has to demonstrate 'the defendant knew that the plaintiff would suffer the brunt of the harm caused by the tortious conduct in the forum, and point to specific activity indicating that the defendant expressly aimed its tortious conduct at the forum.'" *Martin v. Godwin*, 499 F.3d 290, 297-98 (3d Cir. 2007) (quoting *IMO Indus. v. Kiekert AG*, 155 F.3d 254, 266 (3d Cir. 1998)). "If a plaintiff fails to show that the defendant 'manifested behavior intentionally targeted at and focused on the forum,' the plaintiff fails to establish jurisdiction under the effects test." *Id.* at 298 (quoting *IMO Indus.*, 155 F.3d at 265).

In its brief opposing Argentum's motion, Noble states that its "claims against Miller and Silver are based on the tactics they personally employed in an effort to drive Noble out of the market." (Doc. 117, at 10.) In particular, Noble identifies two categories of activity purposefully directed at Pennsylvania: "(i) sending baseless cease and desist letter to Noble in Pennsylvania and (ii) making numerous telephone calls to Noble, alone, and in tandem, over the course of at least five years in an effort to induce [Noble] to stay out of the market for metalized wound care products entirely." (*Id.*, at 11; Doc. 102 ¶¶ 76, 85-86.) In support of these arguments, Noble has provided a Verification from Joel Furey, Noble's Chief Commercial Officer which states, in part, that "[d]uring the course of this business relationship, both Gregg Silver and Thomas Miller called, wrote, e-mailed, and faxed [Noble's] Scranton, Pennsylvania facilities. . .. They also visited our facilities in Pennsylvania on a number of occasions, in connection with their research, development, and production of metalized wound care products." (Doc. 117, Ex. C.) Noble also states that, in the spring

of 2006, "Miller also represented. . . to one of Noble's Pennsylvania customers, Mercy Hospital in Scranton, that Noble had stolen Argentum's ideas and was infringing on its patents. . .." (Doc. 117, at 11.) Noble, thus, argues that "[i]n making these false, disparaging remarks against Noble to dissuade current and potential customers and distributors from working with Noble. . ., Miller directed his tortious conduct at [Pennsylvania], as harming Noble in [Pennsylvania] was the precise focal point of his tortious conduct." (*Id.*) Noble also alleges that, in further effort to drive Noble out of the market, Miller and Silver caused a physician, A. Bart Flick, M.D., to file for a new patent, specifically tailoring this new patent to the specifications of products that Noble has been producing and marketing for several years. (*Id.*, at 12.)

Furthermore, Noble states that "Miller and Silver also purposefully availed themselves of the forum state on numerous other occasions, including calling, writing, and traveling to Pennsylvania, when purchasing metalized fibers from Noble." (*Id.*) According to Noble, "Silver arranged for and participated in at least one meeting held at Noble's facilities in Pennsylvania, in 2001 with Miller, in connection with this business relationship." (*Id.*) Moreover, Noble also states that:

> Miller arranged for and attended numerous meetings at Noble's facilities in Pennsylvania, over the course of a number of years, relating to Argentum's arrangement with Noble as a supplier of metalized fabric to his company. Additionally, Silver sent material to Pennsylvania to be metalized at Noble's Scranton plant regularly, and obtained an accommodation from Noble on the terms of the employment of its outstanding debt owed to Noble in the forum state.

*Id.*

In its reply brief, Argentum states that "Noble ignores that third [*Calder*] prong, obviously implicitly acknowledging that, under the facts here, Noble can never establish that,

11

as *Calder* requires, Messers. Silver and Miller 'expressly aimed' their allegedly tortious conduct at this forum or that this forum is 'the focal point' of the alleged tortious activity." (Doc. 122, at 8.)

In addition to its general argument that Noble has not sufficiently satisfied the "expressly aimed" *Calder* prong, Argentum also specifically argues that Noble has failed to satisfy this criteria with respect to Counts IV and V of its counterclaims. With respect to Noble's Count IV claim, which alleges that "Miller and Silver deliberately caused, and acted to have Argentum Medical cause, the application for the '153 Patent to be prosecuted even though there was no basis to obtain patent protection. . .," (Doc. 102 ¶ 101), Argentum argues that

> any actions taken by Messrs. Silver and Miller to assist in the filing and prosecution of the application that led to the issuance the '153 patent are acts directed to obtaining patent protection for Argentum across the United States. That Noble in Pennsylvania felt an effect of the grant of that patent by the U.S. Patent Office is of no consequence.

(Doc. 122, at 10.) With respect to Noble's Count V claim, which alleges that Miller and Silver made false and misleading descriptions and representations of fact when making statements that Noble's SILVERSEAL brand products infringed on the '153 Patent, (Doc. 102 ¶¶ 106-07), Argentum argues that the evidence that Noble provides in support of its claims, at most, "establishes . . . that Mr. Miller engaged in allegedly tortious conduct that was not focused at any particular forum including Pennsylvania" and that the various activities by Miller and Silver that Noble relies upon for its jurisdictional arguments happened before the '153 Patent was issued and are entirely unrelated to Noble's current claims. (Doc. 122, at 12-17.) Argentum, particularly notes that Noble's allegations identify many allegedly false statements made by Miller at trade shows and that: "(1) none of those trade shows .

. . were held in Pennsylvania and (2) all took place before the '153 patent issued in June of 2007." (Doc. 122, at 12.)

In support of its arguments, Argentum frequently cites to a recent decision from the Western District of Pennsylvania, *Nationwide Contractor Audit Service, Inc. v. National Compliance Management Services, Inc.*, No. 08-08, 2008 U.S. Dist. LEXIS 45370 (W.D. Pa., June 10, 2008). In *Nationwide*, the court determined that a non-resident defendant did not have sufficient contacts with Pennsylvania to allow the court to exercise general jurisdiction and then addressed a whether the court possessed personal jurisdiction over the defendant. *Id.* After determining that the *Calder* effects test provided the appropriate method of analysis, the court specifically considered whether the plaintiff had sufficiently satisfied the third *Calder*, "expressly aimed" element. *Id.*, at *61. After considering the relevant facts of the case, the *Nationwide* court determined that the defendant's actions were insufficient to establish the type of entry needed to establish specific personal jurisdiction under the Calder effects test. *Id.* at *63. In particular, the *Nationwide* court noted that "there is no evidence [defendant's agent] knew at the time she made the comments that [Plaintiff] was a Pennsylvania corporation. . .." *Id.*

The *Nationwide* court also discussed three prior cases discussing specific jurisdiction and non-resident defendants. *Id.*, at *64-67. In the first of these cases, *Waimberg v. Medical Transp. of Am., Inc.*, 52 F. Supp.2d 511 (E.D. Pa. 1999), the plaintiff, a Pennsylvania resident, was offered a job by a California company. After the plaintiff accepted a written offer of employment, the offer was rescinded because investors in the company questioned his ability to perform the job. In the subsequent lawsuit, the plaintiff alleged tortious interference with a contract against the investors, who were Illinois residents

and who challenged the jurisdiction of a federal court situated in Pennsylvania. Considering the case under the *Calder* third prong, the court determined that the defendants had satisfied the third prong because the investors had sent several letters to the plaintiff, by fax, in Pennsylvania and because they had directed several telephone calls to him in Pennsylvania. Accordingly, the court determined that they had to know the plaintiff was a Pennsylvania resident and, consequently, their subsequent interference with the contract had been directed at Pennsylvania. *Waimberg*, 52 F. Supp. 2d, at 514-16. The *Nationwide* court distinguished the *Waimberg* case from the case that it was then deciding by reiterating its earlier finding that none of the evidence in the *Nationwide* case suggested that the defendant's agent knew the plaintiff was a Pennsylvania resident.

In the second case discussed by the *Nationwide* court, *Fetter v. No. Am. Alcohols, Inc.,* No. 06-4088, 2007 U.S. Dist. LEXIS 11470 (E.D. Pa. Feb. 16, 2007), two of three non-resident individual defendants had (1) visited the plaintiff in Pennsylvania on one or more occasions, (2) negotiated the first draft of an employment contract with the plaintiff while they were in Pennsylvania, (3) had exchanged drafts of this contract from their location in Florida with the plaintiff in Pennsylvania, and (4) made allegedly defamatory statements in Pennsylvania. *Fetter*, 2007 U.S. Dist. Lexis 11470, at *22-25. The *Fetter* court, consequently, held that the individual defendants had knowingly aimed their tortious activities at Pennsylvania. The *Nationwide* court distinguished this case, saying that "[n]one of those types of contacts [identified in *Fetter*], or even analogous events, are present in this case." *Nationwide*, 2008 U.S. Dist. LEXIS 45370, at *66-67.

The final case reviewed by the *Nationwide* court, *Bank Express v. Kang*, 265 F. Supp.2d 497 505 (E.D. Pa. 2003), involved claims by a Pennsylvania plaintiff that a

14

California defendant had induced customers to cancel contracts with plaintiff after two of the plaintiff's former employees formed a business relationship with the defendant. The *Bank Express* court determined that because the plaintiff had averred that it performed all client services from its Pennsylvania offices, the alleged contracts interference was expressly aimed at Pennsylvania. *Bank Express*, 265 F. Supp. 2d at 504. Further, the court found that plaintiff's two former employees aiding in the defendants interference were aware that plaintiff was based in Pennsylvania. *Id.* at 505. Again, the *Nationwide* court distinguished the case, stating that "the evidence is clear that Nationwide does not perform all of its services from Pennsylvania; in particular, [Nationwide's agent] explicitly testified that he continued to work from his home in Kansas." *Nationwide*, 2008 U.S. Dist. LEXIS 45370, at *67.

The *Nationwide* court also considered certain allegations made by the plaintiff, particularly the allegation that the defendant's agent had made a number of false statements both within and outside of Pennsylvania. *Id.*, at *68. The court determined that

> one can reasonably conclude that [defendant's agent] did not focus her remarks at Pennsylvania but rather at any location where there was a possibility Nationwide would compete with [the defendant] for . . .contracts. Moreover [Nationwide's] allegations that [defendant's agent] made these remarks to residents of Texas and Ohio creates an even high standard of proof on the question of whether Defendant focused its tortious behavior at Pennsylvania. If a defendant circulates a statement nationally, "the defendant can be said to have expressly aimed the statement at a particular state where there is a unique relationship between the state and the plaintiff's industry or business."

*Id.*, at 68 (quoting *Bank Express*, 265 F. Supp.2d at 506).

The Court believes that the alleged facts of the current case clearly distinguish it from the *Nationwide* decision. Instead, the Court believes that the facts presented here more closely resemble, and are analogous to, the facts in the *Waimberg*, *Fetter*, and *Bank*

15

*Express* cases where district courts found the non-resident defendants' activities sufficient to provide the courts with specific personal jurisdiction over those non-resident defendants. In this case, Miller and Silver, unlike the non-resident defendant in *Nationwide*, were clearly aware of Noble's ties to Pennsylvania. Noble presents considerable allegations that Miller and Silver knowingly carried on a substantial business relationship with Noble in Pennsylvania. (Doc. 117, at 10-12.) Assuming that Noble's representations are accurate,[1] the Court finds that both Silver and Miller were aware that Noble based and conducted most, if not all, of its business and manufacturing operations in Scranton, Pennsylvania.

For this reason, the Court also finds that Miller and Silver targeted the tortious activities alleged by Noble towards Pennsylvania. Counts IV, V, and VI of Noble's counterclaims allege that Miller and Silver engaged in various activities and made numerous false statements that disparaged Noble's products (Count VI), misrepresented the nature, characteristics and qualities of Noble's goods in violation of the Lanham Act (Count V), and attempted to eliminate competition for Argentum's SILVERLON products by coercing Noble to withdraw its SILVERSEAL products from the market (Count IV). (Doc. 102 ¶¶ 100-12.) Thus, the Court believes that Miller and Silver's respective physical locations at the time they made these alleged misrepresentations are irrelevant to the Court's jurisdictional analysis because Miller and Silver were aware that Noble's business and manufacturing center was

---

[1] The Court further notes that Argentum acknowledges that "Miller has made sales call on customers in Pennsylvania" and "met with two Argentum consultants in Pennsylvania." (Doc. 113, at 7.) The Court also notes that Argentum, while stating that the alleged contacts were unrelated to Noble's current counterclaims against Miller and Silver, does not contradict or contest any of Noble's allegations that both Miller and Silver called, wrote, and traveled to Pennsylvania to carry out a business relationship with Noble.

16

located in Pennsylvania and that any harm coming from these alleged misrepresentations would primarily impact Noble in Pennsylvania. In addition to the similarities with the *Waimberg*, *Fetter*, and *Bank Express* cases, the Court also notes that, in *Calder*, the Supreme Court found that the defendants in that case "knew that the brunt of that injury would be felt by respondent in the State in which she lives and works and in which the National Enquirer has its largest circulation." *Calder*, 465 U.S., at 789-90. The same is true here; Miller and Silver were aware that the brunt of any allegedly tortious conduct against Noble would be felt by Noble in the State where Noble has its primary place of business and manufacturing centers. Thus, the Court finds that: (1) Noble's counterclaims against Miller and Silver satisfy each of the three *Calder* prongs and (2) the Court may exercise specific personal jurisdiction over Miller and Silver with respect to these claims.

### B. Personal Jurisdiction Over Corporate Employees For Actions Taken in Course of Employment

The Court takes note of Argentum's argument that this Court does not have personal jurisdiction over either Miller or Silver because their only contacts with Pennsylvania were taken in their capacity as corporate officers of Argentum. (Doc. 113, at 7.) Argentum supports this argument by citing to the district court's decision in United Prods. Corp. v. Admiral Tool & Mfg. Co., 122 F. Supp. 2d 560 (E.D. Pa. 2000), which states that:

> In general, a court does not have personal jurisdiction over an individual defendant whose only contacts with the forum state were taken in his or her corporate capacity. This general rule, however, does not apply when the corporate officer is charged with (1) committing a tort in his corporate capacity or (2) violating a statutory scheme that provides for personal, as well as corporate, liability for corporate actions.

*United Prods.*, 122 F. Supp. 2d, at 562 (internal citations omitted).

However, in the current case, the Court finds that the claims Noble has brought against Miller and Silver are all based on allegedly tortious conduct which Miller and Silver committed themselves. Thus, the Court finds that the general rule foreclosing personal jurisdiction over individual defendants whose only contacts with the forum state occurred in the defendant's corporate capacity does not apply in the current case as Noble's allegations against Miller and Silver fall within a stated exception to the general rule. *United Prods.*, 122 F.Supp.2d, at 562; *see also McMullen v. European Adoption Consultants*, 129 F.Supp.2d 805, 811 (W.D. Pa. 2001) (determining that courts can appropriately determine when the corporate shield doctrine protects individual defendants by considering the officer's role in the corporate structure, the quality of the officer's contacts, and the extent and nature of the officer's participation in the alleged tortious conduct.)

**CONCLUSION**

For the reasons stated above, the Court will deny Plaintiff Argentum Medical's "Motion to Strike Answer to Amended Complaint, Counterclaim, or in the Alternative, Motion to Dismiss Counterclaims Against Gregg Silver and Thomas Miller." (Doc. 112.)

An appropriate Order follows.


| May 21, 2009 | /s/ A. Richard Caputo |
|---|---|
| Date | A. Richard Caputo |
| | United States District Judge |

# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ARGENTUM MEDICAL, LLC, <br><br> Plaintiff, <br><br> v. <br><br> NOBLE BIOMATERIALS, and DERMA SCIENCES, INC., <br><br> Defendants. | NO. 3:08-CV-1305 <br><br> (JUDGE CAPUTO) |

## ORDER

**NOW**, this  21st   day of May, 2009, **IT IS HEREBY ORDERED** that Plaintiff Argentum Medical's "Motion to Strike Answer to Amended Complaint, Counterclaim, or in the Alternative, Motion to Dismiss Counterclaims Against Gregg Silver and Thomas Miller" (Doc. 112) is **DENIED**.

                                              /s/ A. Richard Caputo  
                                              A. Richard Caputo  
                                              United States District Judge